# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

LYSA GLUNT,

Plaintiff,

v.

1565 RALEIGH ST., d/b/a/ TAP AND BURGER AT SLOAN'S LAKE

Defendant.

---

## PLAINTIFF'S COMPLAINT WITH DEMAND FOR JURY TRIAL

---

Plaintiff, Lysa Glunt, by and through her attorney, Ralph Lamar, for this her Complaint, respectfully alleges as follows:

### I.   NATURE OF THE CASE

1.   This employment discrimination action is brought against Defendant 1565 Raleigh St., hereinafter ("Tap and Burger"), by Plaintiff Lysa Glunt for equitable relief and monetary damages to redress the deprivation of civil rights secured to her by the Age Discrimination in Employment Act ("ADEA"), while she was an employee of Defendant.

Specifically, she alleges that Tap and Burger retaliated against her in violation of the anti-retaliation provisions of the ADEA when she was subjected to retaliatory harassment shortly after her reporting to HR about age discrimination in the workplace which ultimately culminated in her constructive discharge. Ms. Glunt alleges that the Defendant's actions caused her mental distress and humiliation, and loss of employment and compensation. She seeks back pay, reinstatement or front pay, compensatory damages, punitive damages, liquidated damages and attorneys' fees and costs of this action.

## II.     JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over the ADEA claim under 28 U.S.C. §§ 1331, because it arises under the laws of the United States.

3.      Venue is proper in this judicial District under 28 U.S.C. § 1391(b),(c) and 42 U.S.C. § 2000e-5(f)(3), because Defendant has offices, conducts business, and can be found in this District, and the cause of action arose and the acts and omissions complained of, occurred therein.

## III.    PARTIES

4.      Plaintiff Lysa Glunt is a citizen of the U.S. currently residing in Denver, CO, and submits herself to the jurisdiction of this court.

5.      Defendant was the employer who engaged in retaliation because of plaintiff's engaging in protected activity which ultimately led to her constructive discharge from her employment.  At all relevant times during plaintiff's employment by Defendant it employed 20 or more employees, and therefore is subject to the provisions of the ADEA and is subject to the jurisdiction of this Court under that statute.

6.      Defendant's office is located at 1565 N. Raleigh St., #100, in Denver, CO. Defendant is therefore subject to the personal jurisdiction of this court.

## IV.    STATEMENT OF FACTS

7.      Plaintiff is a 45 year old woman.

8.      She was hired by Defendant to work as a Bartender on September 9, 2016.

9.      The person responsible for her hire was Chanelle Kawamura.

10.     Plaintiff generally performed her job duties to Defendant's expectations and even won an employee award for 2018.

11. On or about June 11, 2019, plaintiff was told by her manager Scott Conard, that there were issues with her job performance and that her "work ethic" was deteriorating.

12. She disputed the allegation and asked for specific examples but none were provided.

13. Glunt then complained that she was not being treated equally as amongst the other staff members.

14. Conard said he was going to have meetings to discuss job performance with all staff members in the coming weeks.

15. Upon information and belief Conard only met with Michelle McGlone and Plaintiff to discuss their job performance.

16. At the time there were only 2 employees over the age of 40 who reported to Conard: plaintiff and McGlone.

17. At the time Conard supervised approximately 20 individuals.

18. Plaintiff later discussed this meeting with Grace Manlove, Renee Wright and Will Blaies. They told her that Conard had not spoken to them about their job performance.

19. On or about June 17, 2019, Conard and Amy Baczewski, the Assistant Manager, terminated McGlone.

20. Plaintiff and McGlone had started working for Defendant about the same time.

21. Plaintiff was familiar with McGlone's job performance because they worked many shifts together.

22. McGlone worked as a bartender, just like plaintiff.

23. From plaintiff's knowledge and observations McGlone performed her job well and to Defendant's expectations. Furthermore, McGlone had many regular customers who knew her by name and came specifically to the bar to see her.

24. No reason was given McGlone for her termination. Per McGlone's conversation with plaintiff, during the termination meeting Conard was smiling and/or laughing in McGlone's face.

25. McGlone was replaced as a bartender by Allison Cline, a 30 year old woman who was a full time server at the time of McGlone's firing.

26. A bartender position was above that of a server at defendant in terms of prestige and visibility, if not pay as well.

27. Because McGlone was fired without cause, without reason given to her, and replaced by Defendant with someone 10 years younger, combined with the preceding actions by defendant; plaintiff reasonably assumed that Defendant was clearing the place of persons over the age of 40.

28. Plaintiff accordingly believed that Defendant had engaged in age discrimination in the firing of McGlone.

29. Based on these circumstances plaintiff believed that she would be next to be fired or forced out due to her age

30. Plaintiff's belief was objectively reasonable given the circumstances.

31. On Wednesday, July 10, 2019, Manlove and plaintiff met with Dax Christofferson, the HR Generalist.

32.     Plaintiff and Manlove began by asking that their complaint be kept confidential and that the company maintain their anonymity to which Christofferson agreed, even providing a "100% guarantee" in writing.

33.     Plaintiff's main concern was her meeting with Conard in June and the subsequent firing of the only other 40+ year old employee.

34.     Plaintiff stated that she was concerned that the meeting with Conard was designed to "phish" and single out the older employees in the bar to push them out in order to make room for younger employees, possibly including Conard himself. Conard was in his late 20's at the time.

35.     It had been rumored since May 2019 that Conard might be stepping down from his GM duties to a bartender position within one of the three (3) Tap & Burger locations.

36.     Additional concerns discussed by Plaintiff during this meeting with HR included the following:

- Management sharing with Front of House ("FOH") staff when an active staff member was going to be fired or written up prior to it taking place.
- Being picked on and/or singled out due to being an older employee in the Company. Examples of which included:
    - Being instructed to arrive 15 minutes before "scheduled" shift for a pre-shift yet younger bar employees rarely took part of any pre-shifts.
    - Instructed to maintain higher standards for the bar set up and breakdown process than younger employees. There were no negative consequences to younger employees for failing to meet such standards.

- Per Bartender job description:  Introduce yourself to all guests, shake hands, and get their name for their tab. Younger employees not held to this requirement, even though older employees were told repeatedly they would be written up if they did not fulfill the requirement on their shifts, causing the older employees to go behind the younger ones in order to do their job to ensure the older employee's job was not in jeopardy. There were no negative consequences to the younger employees for failing to fulfill this job and brand requirement.
    - After Plaintiff shared with bar co-workers and management via a group app that a big movie opening was taking place across the street from the bar to notify them of the opportunity for increased business she was verbally ridiculed by Conard and Baczewski for doing so.  Yet, there were never any negative consequences, for younger employees sending Memes or Gif's in the app to other employees.
    - Told by Conard to keep her phone off or in her purse behind the bar or she would be written up. Yet younger employees regularly used their phone, i.e. texting or on social media during shifts, causing guests to be ignored and standards of service to suffer, with no negative consequences or threat of such.
    - Told by Conard that plaintiff's work ethic was deteriorating but never provided with any examples of what was purportedly failing and no suggestions for improvement were offered.
- Employees not being treated equally.

6

- - o Younger employees wearing inappropriate attire (belly shirts - both men and women, booty shorts, and for females- braless) with no negative consequences, but older employees had been sent home to change for wearing the same or comparable clothing.
    o Younger employees arriving 15 minutes after shift began and/or hours late with no reason, notes, emergencies and having no negative consequences.
    o Younger employees being provided with multiple options to retake menu tests while older employees were not.
    o Younger employees failed to meet the required Cicerone Certification for employment but were nonetheless allowed to begin working on money making shifts.
    o Younger employees given better shifts on the floor serving and behind the bar even though they do not meet job requirements.
    o Younger employees getting intoxicated on shift and as a result not being able to complete their job duties but no discipline was issued.
  - Creating a workplace environment of gossip and hostility leading to staff not feeling safe in being able to discuss concerns directly with management for fear of backlash.

37. Christofferson did not ask the women to put their complaints in writing.

38. Unfortunately, (upon information and belief), Christofferson provided the details of plaintiff's complaint to Conard, Baczewski, and/or Nicole Westerman, (Director of Operations and part owner) the latter of whom who discussed the complaint with Conard and Baczewski.

39. Within 7 days of Glunt's complaint to Christofferson she began to be harassed by Conard, Baczewski and others.

40. For instance, plaintiff was the subject of open gossip by Conard and Baczewski during her shifts and intimidated and ridiculed by both in front of co-workers and guests. There was aggressive demeanor by the two toward both plaintiff and Manlove. Conard and Baczewski also failed to make eye contact when speaking with plaintiff in a passive-aggressive manner, which was quite demeaning. Conard and Baczewski also made loud and snide comments about Glunt in front of co-workers and guests. This behavior occurred on a regular basis during plaintiff's and Manlove's shifts. Additionally, as set forth below, within 9 days of meeting with Christofferson to discuss plaintiff and Manlove's complaints; both were given a poor employee review, written up and threatened with their jobs. Prior to Glunt's complaint to Christofferson plaintiff had been very friendly with Baczewski, which made the harassing treatment that much harder to understand and to bear.

41. On or about July 13, 2019, Conard and Baczewski told the bar staff that they would be holding "personal sit down" meetings with staff to discuss the "drama" in the workplace.

42. Neither Conard nor Baczewski ever divulged what the alleged "drama" was.

43. On or about July 15, 2019, Conard and Baczewski informed plaintiff and the entire FOH staff that the "personal sit downs" were now "mandatory performance reviews"

44. On July 17, 2019, during plaintiff's "mandatory employee review", Baczewski informed plaintiff they were doing the reviews to try to confirm who had talked about the fact that Conard was stepping down and would be moving to the bar because management wanted to put a stop to it.

45. On or about July 19, 2019 Conard, Baczewski and Eleazar Weshahi met with plaintiff.

46. Conard and Baczewski threatened to discharge Glunt if they heard of her discussing any work related subject or discrimination with any other staff members again.

47. Plaintiff felt intimidated by the threat to her job and realized with clarity that Christofferson's promise to honor her request to keep the complaint confidential had not been honored.

48. Accordingly, because it was apparent that Christofferson had not maintained anonymity as promised, on July 23, 2019, plaintiff sent an e-mail to him in which she indicated that she no longer wished to maintain anonymity regarding her complaint. The goal in doing so was for him to start a formal investigation.

49. Glunt also provided a written summary description of the harassment she had suffered since speaking with him on the 10th of July. Glunt also mentioned the effects of the harassment she had experienced since their original meeting, which included depression and becoming physically sick prior to arriving for her shifts.

50. Finally, plaintiff notified Chistofferson that she was going to file a charge of age discrimination and retaliation with the EEOC.

51. On July 24, 2019, prior to her shift, plaintiff met with Christofferson to discuss her formal written complaint.

52. During this meeting Christofferson stated he had a meeting scheduled that same day, with Katie O'shea, (owner/founder), at noon, and then another with Nicole Westerman, (Director of Operations), at 2:30-3:30 p.m. to discuss plaintiff's formal written complaint.

53. Christofferson did not ask Glunt to provide a written statement detailing her experiences.

54. Christofferson told plaintiff he might have been too specific when discussing the issue with Westerman after his original meeting with plaintiff and Manlove.

55. He also stated that he thought Westerman put two and two together.

56. Finally, he stated that he hoped he had not made things worse for Glunt.

57. Christofferson then told plaintiff that an investigation into her allegations would begin.

58. At noon or shortly thereafter on the July, 24th 2019 O'shea showed up at plaintiff's work location for the meeting with Christofferson.

59. Instead of meeting privately, the two of them sat at the bar where plaintiff was the working bartender and ordered drinks and food while they discussed plaintiff's complaint.

60. Plaintiff had no choice but to serve them while they openly discussed her. Hearing their conversation made her ill, so ill in fact that she had to excuse herself at one point to go to the restroom where she began to cry, became physically sick, and then had to regain her composure in order to continue her scheduled shift.

61. At no time during this meeting did Christofferson or O'shea ask plaintiff for any further details of what had happened to her.

62. Plaintiff never heard any follow-up from Christofferson about the investigation he said he was going to open or from anyone else in upper management/ownership.

63. Manlove was not contacted by anyone as part of any investigation into plaintiff's complaint.

64. Plaintiff received confirmation from multiple staff members that none of them were contacted as part of any purported investigation into plaintiff's complaint.

65. From July 19 through August 27, 2019 plaintiff cried on a daily basis and was regularly physically sick to her stomach.

66. As a result of the stress on her plaintiff began taking heart and blood pressure medications.

67. On or about July 25, 2019, Conard began working as a bartender. However, he continued to maintain FOH management shifts.

68. Once Conard stepped down to the bar, plaintiff's Wednesday day shift for which she had built up the business for over 2 ½ years was removed from her schedule and given to Conard with no explanation or discussion. Younger employees maintained their shifts they had built up over their tenure.

69. Losing a shift for plaintiff meant she was losing pay.

70. On August 6 plaintiff contacted her physician about getting a referral to speak with someone due to her being extremely depressed.

71. On August 11 at 10:15 p.m. or shortly thereafter, Plaintiff phoned Juan Padro (Defendant's founder and co-owner). Glunt was crying uncontrollably at the time of the call.

72. She told Padro what was happening with the bullying, harassment, that there was supposed to be an investigation happening but she didn't believe one had been started.

73. Glunt told him that she had been depressed and physically ill, and that both she and Manlove had been crying all the time.

74. Padro said he knew nothing about any investigation or anything happening at the location.

75. He said he had never been told anything negative about plaintiff or Manlove.

76. He then said "Everyone loves you".

77. Padro also stated "You two probably feel so alone and isolated right now, I'm so sorry. I had no idea anything was happening like this."

78. Plaintiff replied, "Well, thank you I appreciate that. You wouldn't believe the conversations with them. I can't believe this happening. I can't do this anymore, I can't get sick anymore, this is so hard."

79. Plaintiff explained that she believed employees over 40 were essentially being forced out, not treated equally as their younger co-workers and/or fired for no reason. She provided examples of who, and then examples of how.

80. Glunt said that she and Manlove loved the company and the vision of Padro and the founders, but that the current situation was not meeting those standards.

81. Plaintiff told Padro she was physically and emotionally ill due to being intimidated and harassed and could not do it anymore.

82. Padro suggested that HR could help but plaintiff responded that HR was not going to investigate itself and that she truly believed Westerman was involved as well.

83. Padro ended the phone call asking plaintiff if she would give him 24 hours before she made any decision about her future. He told her he would contact her. She agreed to wait for his call.

84. Padro never called Glunt back.

85. On August 12, after spending most of her day crying and being physically sick about the work environment, and not having heard from Padro as he had promised, plaintiff sent

an e-mail at 9:37 p.m. to Alex Lomas (the new General Manager as of July 25, 2019) and Mike McGill (Beverage Director) in which she gave her two week notice.

86. On August 14, plaintiff had a meeting with Lomas regarding plaintiff's e-mail of the 12th. Lomas said "He (Dax) spoke with me about it.. and I think in his defense, he thought things would be better with me there and with Scott stepping down. But with Amy (Baczewski) still managing, that is a problem."

87. From July 19 through August 27, 2019, Plaintiff continued to be subjected to harassment and intimidation by Conard and Baczewski.

88. From July 19 through August 27, 2019, Conard and Baczewski maintained their management positions and/or some position of authority.

89. Plaintiff's last day of work was August 27, 2019.

## COUNT I

## ADEA VIOLATION - RETALIATION

90. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

91. Through her complaint(s) of age discrimination plaintiff engaged in protected activity under the ADEA.

92. The harassment plaintiff was subsequently subjected to was because of her protected activity.

93. A reasonable person would have found the harassment to be objectively unwelcome.

94. Plaintiff found the harassment to be unwelcome.

95. As such the harassment affected a term or condition of plaintiff's employment.

96. Defendant knew or should have known of the harassment as it was conducted by members of management.

97. Defendant failed to take any steps reasonably designed to stop or prevent the harassment from occurring.

98. A reasonable person in plaintiff's shoes would have felt compelled to resign her employment.

99. As a result of the harassment plaintiff was constructively discharged.

100. Plaintiff has been injured by the actions of Defendant which injuries include lost pay and benefits and emotional distress.

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in her favor:

(a) Awarding lost wages, including lost fringe benefits;

(b) Awarding compensatory damages;

(c) Awarding liquidated damages;

(d) Awarding punitive damages;

(e) Order her reinstatement, or in the alternative, award front pay;

(f) Awarding the costs of this action, together with reasonable attorney's fees; and

(g) granting such other relief as the Court deems necessary and appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims properly triable by a jury.

Dated this 13th day of May, 2020.

                                              Respectfully submitted,

By:   *s/Ralph E. Lamar, Esq.*
        Ralph E. Lamar
        CO Attorney I.D. No.  44123
        8515 Braun Loop
        Arvada, CO 80005
        (303) 345-3600
        ralphlamar@ymail.com

        Attorney for Plaintiff